IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20CV393

| | |
|---|---|
| SKANSKA USA CIVIL SOUTHEAST INC., )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>UP COMMUNITY FUND, LLC, )<br>)<br>Defendant. )<br>) | ORDER |

This matter is before the Court upon Defendant's Motion to Dismiss and Alternative Motion to Stay. This motion has been fully briefed and is ripe for disposition.

I.     FACTUAL BACKGROUND

Plaintiff Skanska USA Civil Southeast Inc. ("Skanska") is a commercial contractor who entered into a subcontract agreement with non-party Atlantic Meridian Contracting Corporation ("AMC") pursuant to which AMC agreed to perform certain work on a construction project in Florida. The Subcontract required AMC to obtain performance and payment bonds, but if unable to do so, required AMC to provide some other form of security such as a letter of credit. (Doc. No. 12-1, p. 4). Skanska and AMC are currently in litigation in Florida regarding Skanska's entitlement to the funds at issue. *See* Doc. No. 12-2.

Defendant UP Community Fund, LLC ("UP") is a financial institution in the business of lending funds and providing other financial services, including the issuance of letters of credit. (Doc. No. 1, ¶ 8). On March 3, 2020, UP issued a security instrument labeled "Irrevocable Letter of Credit" at the request of AMC in favor of Skanska as beneficiary in the amount of $380,000.00. (Doc. No. 1-1). The security instrument refers to itself as a "Letter of Credit" no

1

less than twenty times throughout the document. *See id*. Moreover, the instrument states that: "This Letter of Credit sets forth in full the terms of our undertaking. This undertaking shall not in any way be modified, amended or amplified by reference to any documents or contract referred to herein." *Id*. Attached as "Annex 1" to the security instrument is a "Certificate of Drawing" that must be completed and signed by Skanska in order to draw funds. *Id*. The Certificate of Drawing requires Skanska to certify that "pursuant to the Subcontract it is entitled to draw [an inserted amount] under the Letter of Credit (the "Certified Amount")." [1]

The security instrument states that "presentation must be made at or before 4:00 p.m. . . . on a business day (a day on which we are open at our above address to conduct our letter of credit business) . . .." *Id*. Moreover, Skanska was required to provide the completed draw certificate as well as the original Letter of Credit in order to draw funds. *Id*.

The Complaint alleges that on April 14, 2020, Skanska presented the Letter of Credit and related documents for payment by delivering them to UP via federal express, and the documents were received by UP on April 15, 2020. (Doc. No. 1, ¶ 10). UP failed to object or otherwise respond to the presentation in a timely manner. (*Id*. at ¶ 11).[2] Skanska alleges that subsequent demands for payment were made on UP but it did not respond until May 14, 2020, when it refused to honor the presentation because it was not made during a period of time when UP was open. (*Id*. at ¶¶ 12, 13). Skanska again presented the Letter of Credit to UP via hand delivery by courier on July 2, 2020, after Skanska had been notified that UP had reopened its office. (*Id.* at ¶ 14). On July 10, 2020, UP once again refused to honor the presentation, asserting that the

---

[1] The Certificate of Drawing defines the "Subcontract" as the subcontract entered into between Skanska and AMC on September 18, 2019.
[2] UP asserts in its brief that its business was closed for several weeks following the onset of the COVID-19 pandemic.

certification was defective and that the Letter of Credit was in the nature of a performance bond. (*Id*. at ¶¶ 15, 16).

On July 17, 2020, Skanska filed the present suit alleging wrongful dishonor of the Letter of Credit. UP has moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, stay this action pending disposition of the Florida litigation between Skanska and AMC.

## II. DISCUSSION

### A. Standard of Review

In considering a motion pursuant to Rule 12(b)(6), the court accepts the complaint's factual allegations as true and asks whether it states a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) does not provide an avenue by which a court may "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). "Generally, courts do not consider extrinsic evidence in a motion to dismiss pursuant to Rule 12(b)(6) because the inquiry is limited to the complaint and the documents attached thereto or incorporated by reference." *Couick v. Wyeth, Inc.*, 2012 WL 79670, at *4 (W.D.N.C. Jan. 11, 2012) (citation omitted).

## B. The Security Instrument

Letters of credit are governed by Article 5 of the North Carolina Commercial Code, N.C. Gen. Stat. § 25-5-101 *et seq*. An Article 5 letter of credit is a "definite undertaking . . . by an issuer to a beneficiary at the request or for the account of an applicant or, in the case of a financial institution, to itself or for its own account, to honor a documentary presentation by payment or delivery of an item of value." N.C. Gen. Stat. § 25-5-102(10). Defendant UP argues that Skanska's Complaint alleging wrongful dishonor must be dismissed because the security instrument at issue is not a Letter of Credit, but rather is "in the nature of" a secondary assurance, and thus is not governed by Article 5 of the North Carolina Commercial Code.

While the security instrument at issue herein is labeled "Irrevocable Letter of Credit" the "label on a document is not conclusive." *Id.*, cmt. 6. "[U]ndertakings whose fundamental term requires an issuer to look beyond documents" or "determin[e] . . . an extrinsic fact" are not governed by Article 5. *Id*. On the other hand,

> [N]o particular phrase or label is necessary to establish a letter of credit. It is sufficient if the undertaking of the issuer shows that it is intended to be a letter of credit. In most cases the parties' intention will be indicated by a label on the undertaking itself indicating that it is a "letter of credit," but no such language is necessary.

*Id*.

UP argues that the security instrument is derivative of and premised upon the terms of the Subcontract between Skanska and AMC because the security instrument's Certificate of Drawing defines "Subcontract" with specificity and requires Skanska to certify that "pursuant to the Subcontract it is **entitled to** draw [an inserted amount] under the Letter of Credit (the "*Certified Amount*")." (emphasis added). UP contends that this language conditions payment on Skanska's entitlement to the funds pursuant to the Subcontract and therefore requires the issuer

4

to "look beyond documents" and to examine extrinsic facts to determine whether, in fact, Skanska is entitled to the funds. Consequently, it is removed from the scope of Article 5 entirely.

Contrary to UP's argument, however, the security instrument merely requires that Skanska "certify" that pursuant to the Subcontract it is entitled to draw the funds. A mere reference to the underlying agreement does not remove the security instrument from the scope of Article 5. In fact, "[i]f an undertaking constituting a letter of credit under G.S. 25-5-102(a)(10) contains nondocumentary conditions, an issuer shall disregard nondocumentary conditions and treat them as if they were not stated." N.C. Gen. Stat. § 25-5-108(g). Comment 9 to N.C. Gen. Stat. § 25-5-108 also belies UP's position:

> **The responsibility of the issuer under a letter of credit is to examine documents and to make a prompt decision to honor or dishonor based upon that examination. Nondocumentary conditions have no place in this regime** and are better accommodated under contract or suretyship law and practice. **In requiring that nondocumentary conditions in letters of credit be ignored as surplusage, Article 5 remains aligned with the UCP** (see UCP 500 Article 13c), approves cases like *Pringle-Associated Mortgage Corp. v. Southern National Bank*, 571 F.2d 871, 874 (5th Cir.1978), and rejects the reasoning in cases such as *Sherwood & Roberts, Inc. v. First Security Bank*, 682 P.2d 149 (Mont. 1984).
>
> Subsection (g) recognizes that letters of credit sometimes contain nondocumentary terms or conditions. Conditions such as a term prohibiting "shipment on vessels more than 15 years old," are to be disregarded and treated as surplusage. Similarly, a requirement that there be an award by a "duly appointed arbitrator" would not require the issuer to determine whether the arbitrator had been "duly appointed." **Likewise a term in a standby letter of credit that provided for differing forms of certification depending upon the particular type of default does not oblige the issuer independently to determine which kind of default has occurred.** These conditions must be disregarded by the issuer. Where the nondocumentary conditions are central and fundamental to the issuer's obligation (as for example a condition that would require the issuer to determine in fact whether the beneficiary had performed the underlying contract or whether the applicant had defaulted) their inclusion may remove the undertaking from the scope of Article 5 entirely. *See* Section 5-102(a)(10) and Comment 6 to Section 5-102.
>
> Subsection (g) would not permit the beneficiary or the issuer to disregard terms in the letter of credit such as place, time, and mode of presentation. **The rule in subsection (g) is intended to prevent an issuer from deciding or even**

5

> **investigating extrinsic facts**, but not from consulting the clock, the calendar, the relevant law and practice, or its own general knowledge of documentation or transactions of the type underlying a particular letter of credit.
>
> Even though nondocumentary conditions must be disregarded in determining compliance of a presentation (and thus in determining the issuer's duty to the beneficiary), an issuer that has promised its applicant that it will honor only on the occurrence of those nondocumentary conditions may have liability to its applicant for disregarding the conditions.

N.C. Gen. Stat. § 25-5-108 cmt. 9 (emphasis added).

Thus, even where a letter of credit includes documentation or references an external document, the issuer is not entitled to look behind the presentation to the agreement between the applicant and beneficiary when determining whether it is appropriate to issue payment in response to the beneficiary's presentation on a letter of credit. For example, in *Provident Bank of Maryland v. Travelers Property Casualty Corporation*, 236 F. 3d 138 (4th Cir. 2000), the court considered a claim by an issuer against its insurer in connection with wrongful dishonor of a letter of credit. The court explained that the requirement in a letter of credit that presentation be accompanied by a certification that the customer had defaulted on its obligation to pay interest on the underlying loan did not transform the letter of credit into an agreement to answer secondarily for the loss of another. The court stated: "Upon presentation to Provident Bank [the issuer] of a draft with the certifying documentation, whether the documentation was substantively accurate or not, Provident Bank became obligated to honor the draft" and "even if Banca del Sempione [the beneficiary] had falsely certified the occurrence of the default when it presented a draft, Provident Bank would not have been relieved of its duty to honor the draft." 236 F. 3d at 147.

The Letter of Credit in this case does not require UP to take any action independent of reviewing the presentation for compliance with the terms of the Letter of Credit. Instead, it

6

simply requires Skanska to certify that Skanska is entitled to the funds requested, which Skanska alleges that it did. Accordingly, UP is not required to determine whether Skanska is entitled to the funds, or whether Skanska or AMC have performed under the Subcontract. Accordingly, it appears to the Court that UP's argument that the security instrument is not a Letter of Credit governed by Article 5 is without merit.

### C. Presentation of the Letter of Credit

UP argues that even if the security instrument is a Letter of Credit, Skanska's purported presentations did not conform to the underlying terms of the instrument. Specifically, UP asserts that the first presentation was made on a day that UP was not open for business and that both presentations were deficient in that each certified that a "copy" of the Letter of Credit was attached as opposed to the original as required by the language of the Letter of Credit. These defenses and Skanska's arguments in response are rife with disputed factual allegations and extrinsic documents that are simply improper for the Court to consider at this stage of the litigation. The Court finds that the Complaint states a plausible claim that UP wrongfully dishonored the Letter of Credit.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss and Alternative Motion to Stay is hereby DENIED.

Signed: November 9, 2020

Graham C. Mullen
United States District Judge